719

Emmett E. McKAIG, Jr., and the Junction
City Bottling Co., a Kansas Cor-
poration, Appellants,

v.

Jimmy R. PARAMORE, a minor by and
through his next friend, Hardy
A. Paramore, Appellee.

No. 9948.

United States Court of Appeals
Tenth Circuit.

Oct. 3, 1968.

Charles S. Fisher, Jr., Topeka, Kan.
(O. B. Eidson, Philip H. Lewis, James
W. Porter, William G. Haynes, Charles
N. Henson, Peter F. Caldwell, Roscoe E.
Long, R. Austin Nothern and Brock R.
Snyder, Topeka, Kan., on the brief), for
appellants.

William F. Stahl, Junction City, Kan.
(George F. Scott, Junction City, Kan.,
on the brief), for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Jimmy R. Paramore, a minor, by Hardy A. Paramore as his next friend, brought this action against Emmett E. McKaig, Jr., the Junction City Bottling Co., Inc., and James M. Tapley to recover damages for personal injuries. Shortly before the trial began, the case was dismissed without prejudice as to Tapley. From a judgment on a jury verdict in favor of Jimmy, McKaig and the Bottling Company have appealed.

While Jimmy was riding his bicycle across the intersection of Sixth Street and Garfield Street in Junction City, Kansas, at about 3:15 p. m. on May 29, 1964, the rear end of his bicycle was struck by a Pontiac station wagon being driven by Tapley, and almost immediately thereafter Jimmy and his bicycle were struck by a truck owned by the Bottling Company, being driven by McKaig, its employee.

At the time of the accident, Jimmy was eight years of age.

From the intersection, Sixth Street extends east and west, and Garfield Street extends north and south. At the time of the accident, Sixth Street, west from the intersection, was a four-lane street, marked for two lanes of traffic in each direction. East from the intersection, it narrowed and was a two-lane street, marked for one lane of traffic in each direction.

East of the intersection, parking was allowed on both sides of Sixth Street. Sixth Street was a through street and there were stop signs on both sides of Garfield Street, adjacent to the intersection, which required Garfield Street vehicular traffic to stop before entering the intersection.

A grade school and a high school were located near the intersection. Pupils at such schools crossed the intersection when going to and from school.

At the time of the accident, there was a school crossing caution sign located on the south side of Sixth Street, about 150 feet west of the intersection.

Except on Saturdays and Sundays and days of school vacation periods, a school stop sign on a standard was placed in the intersection during certain hours. In other words, it was placed in the intersection, during certain hours, on days pupils in either or both of the two schools were required to go to their respective schools for school purposes. What those hours were, the record does not show. It had been placed in the intersection on the day of the accident, but had been removed before the accident occurred. The sign read, "School Lane, Stop." When such sign was not in place, on Saturdays and Sundays and holidays and during school vacation periods, Sixth Street was not a stop street for vehicles approaching the intersection.

There were two painted crosswalks on the pavement, extending across Sixth Street, one on the east side and one on the west side of the intersection, for the use of Garfield Street pedestrians crossing Sixth Street. The crosswalks were hatched with painted diagonal lines. Three feet to the west of the west crosswalk, there was a painted bumper line, the purpose of which was to provide three feet of clearance between stopped vehicles and pedestrians using the crosswalk. There was a like bumper line in the east crosswalk.

Students at the grade school and high school used these crosswalks in going to and from school. While the school term had ended the day before the accident, students had to return to their schools on the day of the accident to receive their grade report cards, and the stop sign on the standard was in place in the intersection during part of the day of the accident.

Shortly before the accident, Patricia Lathrop, a student at the high school, had approached the intersection and was standing in the west side crosswalk, waiting to cross Sixth Street from north to south. She was in plain view of drivers of vehicles approaching the intersection on Sixth Street from the west.

Tapley saw her standing in the crosswalk when he approached the intersection. The westbound traffic on Sixth Street had stopped to permit Lathrop to cross Sixth Street. When the accident happened, she had proceeded about halfway across the westbound traffic lanes, and the vehicles in the westbound lanes were still stopped, waiting for her to cross. Shortly before the accident, the Tapley vehicle was in the left lane of the eastbound traffic. The Bottling Company truck, driven by McKaig, and also traveling easterly was following closely behind the Tapley vehicle and in the same traffic lane.

Tapley first saw Jimmy on his bicycle as he emerged from between two vehicles in the westbound traffic lanes. Tapley "jammed on" his "brakes," but was unable to stop in time to avoid hitting Jimmy's bicycle, and the right front fender of the Tapley vehicle struck the rear end of Jimmy's bicycle. Tapley testified that "when I hit the back of his bicycle it spun him around, and he throwed his [left] foot [1] down and tried to push himself back up, and by that time the truck came around my right-hand side and the boy disappeared."

A traffic officer testified that the Tapley vehicle laid down skid marks for 27½ feet, which ended at the point of impact between such vehicle and the bicycle; that the truck traveled 47 feet from its point of impact with Jimmy until it stopped.

Lathrop testified that she did not actually see the Tapley vehicle strike Jimmy's bicycle, but when she heard the noise made by the skidding tires she stopped and looked and saw the truck "go around the" Tapley vehicle "on the right side" and run over Jimmy; that after the truck passed over him she went over to where Jimmy was lying, and that Jimmy's arms and legs were doubled up in his bicycle and that he was unconscious.

The evidence of Lathrop and Tapley established that the truck passed the Tapley vehicle on its right side in the intersection and that the interval between the two impacts was very short.

Tapley testified that after stopping his vehicle, he moved the transmission lever into the parking position and went to where Jimmy was lying; that Jimmy was lying next to the curb "still astraddle of his bicycle" and that his legs were "down through the side of the bicycle, and his arms around the handle bars" and that he did not appear to be conscious.

Notwithstanding the fact that Tapley had jammed on his brakes and skidded his tires, McKaig, instead of slowing down, turned into the other lane to go around Tapley's vehicle. He testified that he thought Tapley was going to make a left turn. It should be noted that there were two or three cars stopped in the westbound lanes, which would block Tapley from making a left turn until they had moved westwardly. He had not signalled for a left turn, either by hand or mechanically, and there was no evidence he intended to make a left turn.

McKaig testified he was familiar with the intersection and passed over it an average of eight times a week, and that he knew that the crosswalks were used by children going to and from the grade school and high school.

Jimmy was not on his way to or from school when the accident happened. He was going to see his father at the latter's place of work. He was rendered unconscious by the impact of the truck and the only thing he remembered was that he was riding his bicycle and going to see his father. His mind was a blank as to what occurred in the intersection.

There was no evidence, whatever, that Jimmy did not stop at Sixth Street before entering the intersection.

McKaig also testified that when he first saw Jimmy, "he looked like he was hit" and "I hit my brakes and pulled the emergency brake on." Notwithstanding such brake applications, the truck trav-

---

1. Tapley testified it was Jimmy's left foot.

eled 47 feet from its impact with Jimmy before it stopped.

The pretrial order stated that the issues to be determined by the jury were:

"a. * * *

"b. Was the defendant, Emmett E. McKaig, Jr., negligent in the operation of the vehicle owned by his employer, the Junction City Bottling Company, Inc., and if so, was such negligence a proximate cause of the collision.

"c. Was the plaintiff guilty of negligence which contributed to cause the collision.

"d. The amount of damages, if any." [2]

Counsel for McKaig and the Bottling Company do not contend that there was not enough evidence to sustain a finding by the jury that McKaig was negligent and such negligence was the proximate cause of the truck colliding with Jimmy. They predicate their claims of error on one instruction given by the court, the refusal of the court to give four instructions requested by them, and the contention that the court in its charge to the jury did not fully present McKaig's and the Bottling Company's "theory of the case."

Section 15–520 of the 1956 Revised Ordinances of Junction City, Kansas, reads:

"Section 20. (a) The driver of a vehicle may overtake and pass upon the right of another vehicle which is making or about to make a left turn.

"(b) The driver of a vehicle may overtake and, allowing sufficient clearance, pass another vehicle proceeding in the same direction either upon the left or upon the right of a roadway with unobstructed pavement of sufficient width for four or more lines of moving traffic when such movement can be made in safety. No person shall drive off the pavement or upon the shoulder of the roadway in overtaking or passing on the right."

Section 8–539, Kan.Stat.Ann., in part reads:

"(a) * * * the driver of a vehicle may overtake and pass upon the right of another vehicle only under the following conditions:

"(1) When the vehicle overtaken is making or about to make a left turn;

"(2) upon a street or highway with unobstructed pavement not occupied by parked vehicles of sufficient width for two or more lines of moving vehicles in each direction;

"(3) upon a one-way street, or upon any roadway on which traffic is restricted to one direction of movement, where the roadway is free from obstructions and of sufficient width for two or more lines of moving vehicles.

"(b) The driver of a vehicle may overtake and pass another vehicle upon the right only under the conditions permitting such movements in safety. In no event shall such movement be made by driving off the pavement or main-traveled portion of the roadway."

Here, while there were four traffic lanes in Sixth Street, as it entered the intersection from the west, it converged into two traffic lanes at the east side of the intersection.

As McKaig approached the intersection, a child and student at the high school, Patricia Lathrop, was standing in plain view of McKaig at the north end of the west crosswalk, waiting for the westbound traffic to stop and permit her to cross over from the north to the south side. The westbound traffic had stopped and Lathrop had started to cross over and had reached a point about the middle of the westbound traffic lanes when she heard the screeching of the Tapley vehicle's tires, whereupon she stopped and looked and saw the truck go around the Tapley vehicle on its right

2. Paragraph "a." is omitted, because it referred only to the defendant, Tapley.

and run over Jimmy. Tapley testified that the right front fender of his vehicle struck the rear of Jimmy's bicycle and spun him around and "he throwed his [left] foot down and tried to push himself back up, and by that time the truck came around my righthand side and the boy disappeared."

Thus it was established that the truck passed the Tapley vehicle on the right thereof and in the intersection, and the jury were fully warranted in so finding.

McKaig made such movement after Tapley had jammed his brakes so hard that his tires skidded and emitted a screeching sound, showing Tapley was endeavoring to stop quickly because of a suddenly arising situation, while westbound traffic was stopped for pedestrians, and in an intersection where children from nearby schools crossed Sixth Street, as McKaig well knew.

McKaig testified that he thought Tapley was going to make a left turn, but there were two or three cars in the intersection in the westbound traffic lanes, and Tapley had given no turn signals, either by hand or mechanically, that he intended a left turn and had done nothing to indicate he intended to make such a turn. Instead of slowing down and looking to see if he could pass Tapley's vehicle safely on the right, McKaig pulled around Tapley's vehicle and ran over Jimmy. He did not set his brakes until he saw Jimmy, and notwithstanding he applied both foot and emergency brakes, the truck traveled 47 feet after its impact with Jimmy.

McKaig crossed the intersection an average of eight times per week. He knew it was crossed by children attending the two nearby schools. While a school term had ended the day before the accident, the pupils were required to return to their respective schools on that day to pick up their report cards.

The hour of the day when the accident occurred, and the fact that the school stop sign which had been in place part of that day had been removed, gave no assurance to McKaig that school children would not be crossing the intersection. School children frequently loiter when returning home from school.

True, McKaig was not required to stop before he entered the intersection, because the school stop sign on the standard was not in place in the intersection. But because of the school caution warning sign, the character of the intersection, the use of crosswalks by school children, the narrowing of Sixth Street at the east end of the intersection, the fact that the traffic in the westbound lane had stopped to permit a child in the west crosswalk to cross the intersection, the fact that the child was proceeding to cross, and the fact of Tapley's sudden, hard brake application and his tire-skidding noise, McKaig was required to proceed with caution, which he failed to do.

Moreover, in passing Tapley's vehicle on the right side in the intersection, he made a movement which "could not be made in safety," and he made no effort to ascertain whether he could make such movement in safety before proceeding to pass the Tapley vehicle. That such movement could not have been made in safety under the existing conditions would have been obvious to a person of ordinary prudence, had he slowed down and ascertained the existing conditions. The evidence clearly established negligence by McKaig, which was the proximate cause of Jimmy's injuries.

Counsel for McKaig and the Bottling Company assert that the court erred in giving Instruction No. 19, which reads as follows:

"You are instructed that a motorist driving upon a street where children are likely to be crossing is required to keep his motor vehicle under control and to so manage his vehicle as to be able to turn aside or stop and avoid an accident in the light of the apparent risk that children may not exercise the care for their own safety and protection that adults are expected to exercise."

Counsel for McKaig and the Bottling Company do not contend that the instruction was an incorrect statement of Kansas law.[3] They assert it should not have been given, because there was no evidence that at the time the accident occurred children were likely to be crossing Sixth Street.

Two children were crossing the intersection at the very time of the accident, both of school age, one, Jimmy, and the other, Patricia Lathrop. She was in plain view of McKaig as he approached the crossing, and the westbound traffic had stopped for her to cross over. School children were required to go to their nearby schools to pick up their report cards on the day of the accident. The evidence established that in going to and returning from their respective nearby schools, many children crossed Sixth Street at the intersection. The time of the accident at 3:20 p. m. was no assurance to McKaig that school children would not then be crossing the intersection.

█ The character of the crossing and the attendant facts and circumstances at the time of the accident required McKaig to exercise caution and manage his vehicle as set forth in Instruction No. 19, given by the court. We hold the instruction was proper.

McKaig's and the Bottling Company's requested Instructions No. 11 and No. 12, refused by the court, read:

"No. 11

"You are instructed that the laws of Kansas provide that every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the crosswalk or, if there is no crosswalk, at a clearly marked stop line, but if none, then at a point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection.

"No. 12

"The laws of Kansas provide that preferential right of way at an intersection may be indicated by stop signs. Every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop and, after having stopped, shall yield the right of way to any vehicle which has entered the intersection from another highway or which is approaching so closely as to constitute an immediate hazard, but a driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection shall yield the right of way to the vehicle so proceeding."

---

3. The instruction was a correct statement of the Kansas law. In Ratcliffe v. Speith, 95 Kan. 823, 149 P. 740, 741, the court in part said:
"* * * It is true, also, that motorists may ordinarily assume that pedestrians or others using the street will exercise ordinary care. They have no right, however, to assume that the way will always be clear and travelers will always be alert to avoid collision. On the other hand, it is their duty to be vigilant and careful to avoid injuring those who are sharing the use of the streets with them. * * * It is incumbent on them to be particularly watchful at street crossings, at places where many are boarding or leaving streets cars, at places of entertainment where large numbers are coming and going, at publ'c school buildings, and in such places where on account of the crowd or confusion or other circumstances people are not likely to observe the approach of automobiles. Especially is it their duty to be alert and watchful near school houses and where there are groups of children who may not exercise the care or take the precautions that would be observed by people of more mature years. All know that children impelled by the instincts of immaturity are often heedless of danger, and hence motorists are bound to exercise a degree of care and caution commensurate with this known characteristic and the circumstances of the situation. It is said that the operator of a 'car in a street where there are children may well be required to manage his car with reference to all the risks that may reasonably be expected, and among these may be reckoned the risks arising from the heedlessness and indiscretion of children in the street.' * * *"

Sixth Street was a stop street at the intersection, and that fact was indicated by a stop sign on the west side of Garfield Street, immediately north of where Jimmy entered the intersection, but there was no evidence, whatever, that Jimmy did not stop in obedience to the stop sign immediately before entering the intersection at Sixth Street. Hence, there were no facts to which Instruction No. 11 could be applied. It would also have been bad, because it would have carried a possible implication to the jury that Jimmy did not so stop.

Instruction No. 12 was bad for the same reason. If it had dealt only with Jimmy's duty to yield the right of way, as set forth in the requested instruction, coupled with an instruction on the degree of care required of children of tender years, it might have been proper, but it was neither so coupled nor limited.

By Instruction No. 13, counsel for McKaig and the Bottling Company requested the court to set forth verbatim certain provisions of the 1956 Revised Ordinances of Junction City, Kansas, among which was 15–501(b). Subsection (b) reads:

"When stop signs are erected upon highways intersecting a through street at the entrances thereto or at the entrance to any intersection, every driver of a vehicle shall stop at every such sign or at a clearly marked stop line before entering the intersection except when directed to proceed by a police officer or traffic control signal."

Counsel, in their brief, state that the court gave substantially all of such requested Instruction No. 13, except subsection (b). Subsection (b) was clearly properly refused, because there was no proof, whatever, that Jimmy did not stop at an appropriate place before entering the intersection.

Instruction No. 16, requested by counsel for McKaig and the Bottling Company, read as follows:

"I instruct you that the law is well established that the operator of an automobile upon a public highway may lawfully assume that others using the highway will observe the law of the road, and he is not guilty of negligence unless and until he has knowledge to the contrary. In this connection the driver of an automobile on a main or primary highway is acting wholly within his rights in assuming that a vehicle or bicycle approaching such main highway on a secondary road where there is a regularly established stop sign will be brought to a complete stop before the same is driven out into the intersection of the two roads, and the driver of the car on the main or primary highway cannot be charged with negligence in acting upon such an assumption. The traveler on the main or primary highway can only be charged with negligence under such circumstances from the time that he has knowledge that the driver of the secondary highway intends to disobey the stop sign and enter on the highway without stopping. After he has such knowledge he is required under the law to use the care of an ordinary, prudent person in attempting to avoid a collision with the other automobile."

Counsel for McKaig and the Bottling Company admit the court gave in substance the first sentence of the instruction, but assert it erred in not giving the remaining three sentences. In so doing, the court acted properly. There is no evidence that Jimmy did not come to a complete stop at an appropriate place before entering the intersection.

The court gave a correct instruction on contributory negligence, as applicable to children. Jimmy was eight years of age. In such instruction, the court in part said:

" * * * If you find from the preponderance of the evidence that plaintiff was guilty of an act of negligence which caused or contributed to the collision that occurred at the intersection of Sixth Street and Garfield Street in Junction City, Kansas,

then plaintiff would be barred from recovery in this case. * * *

"In this connection I instruct you that it has been established by the evidence in this case that Jimmy R. Paramore was a minor, 8 years of age, at the time of his injury. With respect to the question of contributory negligence you are instructed that a child is not bound to exercise the same degree of care for his safety that is required of an adult.

"While there is no inflexible rule or standard in terms of years which can be laid down as a guide for determining the question of negligence on the part of a child, the law requires of a child that degree of care and caution which is ordinarily exercised by children of the same age, intelligence, capacity, and experience under the circumstances then existing. * * *"

In the case of Riley v. Holcomb, 187 Kan. 711, 359 P.2d 849, 855–856, the trial court had instructed the jury with respect to contributory negligence by a child, as if he were an adult, and the Supreme Court of Kansas in reversing the trial court for that reason, in its opinion said:

"* * * we think that in instructing a jury in a case where a child of tender years is charged with contributory negligence of an act which resulted in his injury or death, the court has the duty to frame its instructions so as not to refer to the law of contributory negligence applicable to an adult, but in one complete instruction, advise the jury of the law of contributory negligence applicable only to a child of tender years."

The contention that Instructions Nos. 11, 12, 13 and 16 were necessary to present McKaig's and the Bottling Company's theory of the case is not well taken. McKaig was plainly guilty of negligence and the only excuse he gave for passing the Tapley vehicle on its right and in the intersection was that he thought Tapley was going to make a left turn. That, as we have shown, was a violent assumption. Tapley did not indicate in anywise that he was going to make a left turn.

The requested and refused instructions could only have been applicable to the issue of contributory negligence and were improper for the reasons we have shown. The court's refusal to give them did not constitute a failure to present McKaig's and the Bottling Company's theory of the case.

We have examined the court's charge in the original record, since it is not set forth in full in the appendix. We are convinced that it fully and fairly set forth both Jimmy's and McKaig's and the Bottling Company's theories of the case, and that it correctly instructed the jury with respect to the law of Kansas and the ordinances of Junction City, Kansas, applicable in the instant case.

Affirmed.